**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KEVIN BROOKS, DAVID GATER,** | ) | |
| **MATTHEW WARD, CRAIG** | ) | |
| **WORKMAN, DANIEL EMBRY and** | ) | |
| **JOSEPH GAMMON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:16-cv-02269** |
| | ) | **Judge Aleta A. Trauger** |
| **TIRE DISCOUNTERS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court are the defendant's six separate Motions for Summary Judgment (Doc. Nos. 49–54), seeking judgment in the defendant's favor on the six plaintiffs' claims under the Fair Labor Standards Act ("FLSA") and state law for overtime compensation and other damages. Each motion has been fully briefed and is ripe for review. For the reasons set forth herein, the motion seeking judgment in the defendant's favor on the claims brought by plaintiff David Gater (Doc. No. 49) will be granted, and the other motions (Doc. Nos. 50–54) will be denied insofar as they pertain to the FLSA claims but granted with respect to the state law claims.

## I.    PROCEDURAL BACKGROUND

Plaintiffs Kevin Brooks, Daniel Embry, Joseph Gammon, David Gater, Matthew Ward, and Craig Workman filed this lawsuit in August 2016 against their former employer, defendant Tire Discounters, Inc. ("TDI"), asserting that, while employed by TDI, they regularly performed work in excess of forty hours per week and that TDI willfully failed to pay them overtime wages as required by the FLSA. Instead, they were misclassified as employees who were "exempt" from the requirements of the FLSA pertaining to overtime pay and paid a salary that did not vary

based on the number of hours worked. In addition to their FLSA claims, they assert state law claims for "Unjust Enrichment/Quantum Meruit/Breach of Contract." (Compl., Doc. 1, at 3.) They seek a declaratory judgment that TDI violated the FLSA and that the violation was willful, an award of damages in the amount of unpaid compensation owed under the FLSA, plus interest and liquidated damages, attorneys' fees and costs. (*Id.* at 4.)

TDI's Motions for Summary Judgment argue that each plaintiff was properly classified as exempt under the FLSA and, as such, was not entitled to overtime pay and that their state law claims are insufficiently pleaded and preempted by the FLSA. With respect to plaintiff Gater, TDI also argues that his claims are barred by the applicable statute of limitations.

In their joint Response to the defendant's Motions for Summary Judgment, the plaintiffs argue that TDI has the burden of proving an exemption under the FLSA and that TDI cannot establish that any of the plaintiffs qualifies for the exemption for "executive" employees under 29 C.F.R. § 541.100(a). In particular, they argue that there is a material factual dispute as to whether the plaintiffs had the authority to hire or fire other employees and as to whether the plaintiffs' suggestions and recommendations as to hiring, firing and promotions were given "particular weight." *Id.* § 541.100(a)(4). The plaintiffs argue that there is also a question of fact as to whether the defendant's violation of the FLSA was "willful" for purposes of application of the statute of limitations to Gater's claims. They do not address the defendant's argument that their state law claims are preempted by the FLSA.

## II. MATERIAL FACTS[1]

Defendant TDI is in the business of selling tires and other car parts, servicing vehicles, and installing tires. During 2014 and 2015, the general time frame relevant to this lawsuit, TDI

---

[1] Unless otherwise indicated, the facts set forth herein are undisputed for purposes of the defendant's motions.

was rapidly expanding and opened several new stores in and around the Nashville area. The plaintiffs were hired to work in these new stores.

Each TDI store is managed by a general manager (also called a "store manager"), who is responsible for running the entire store. Each store generally has several sales associates who work in the front of the store and are primarily responsible for selling tires and other equipment. The sales associates report directly to the general manager. The back of the store, or service center, is where service technicians and tire technicians work. Most TDI stores have a service manager who is responsible for managing the service center. The technicians report directly to the service manager, who reports to the general manager. The general manager reports to a regional manager.

Each plaintiff in this lawsuit worked for TDI as a general manager, service manager, or both during the 2014–2016 time frame. Most of them started as manager trainees. The regional managers to whom they reported were Rafe Barber and, later, Dan Keim.

It is undisputed for purposes of the defendant's Motions for Summary Judgment that the positions of general manager and service manager were at all times salaried positions and that each plaintiff, at all times during his tenure with TDI, earned more than $455 per week. Generally, they earned between $600 and $750 per week and were also eligible for monthly commissions and spiffs, defined as "Bonuses based on Individual Performance." (Doc. No. 43-3, at 1.) The plaintiffs also concede, at least for purposes of summary judgment, that, at all times during their employment, they supervised and managed at least two other employees, that the primary duty of a general manager consisted of managing or running the particular store to which he was assigned, and that the primary duty of a service manager consisted of managing or running the service center of a particular store.

TDI expected managers to work fifty-two scheduled hours per week and understood that they generally worked more than that during the time period in question. All of the plaintiffs maintain that they worked substantially in excess of forty hours per week on a regular basis during their employment.

Jamie Ward, TDI's Chief Operating Officer, submitted an Affidavit in which he attests that "[b]oth the general manager and the service manager have the power, and authority to, interview, hire, discipline and terminate employees." (Doc. No. 49-1, at 3, J. Ward Aff. ¶ 22.[2]) He also attests that both general managers and service managers undergo "a full day training program" "to go over the job responsibilities and make sure there was a uniform understanding by the managers of their primary duties." (*Id.* ¶ 25.) The written Job Description for general managers states broadly that the "store manager is responsible for recruiting, hiring, training, developing and evaluating the staff [of] the retail store location." (Doc. No. 49-1, at 5.) The Service Manager Job Description states that the service manager has the authority to "[a]ssist in the hiring, discipline and termination of shop staff." (*Id.* at 6.)

### A.     Kevin Brooks

Plaintiff Kevin Brooks was hired by TDI in March 2014 as a manager trainee. He became a general manager in July 2014, was put on a Performance Improvement Plan in October 2014, and was demoted to service manager in February 2015. He was eventually promoted back to the position of general manager in November 2015 but quit his job in February 2016.

Brooks testified in his deposition that he does not specifically recall ever having seen a copy of the general manager Job Description, but he conceded that it was probably in the

---

[2] He equivocates somewhat on this point with regard to service managers, stating that they are "given the authority to *assist in* hiring employees for the service center including the service center employees." (Ward Aff. ¶ 19 (emphasis added).)

materials given to him when he was hired. (Doc. No. 43, Brooks Dep. 35–36.) He was sent to Cincinnati for a week of training, which consisted of being placed in stores that were short-staffed and learning while doing. He sat in on one day of training at the corporate office, but that training consisted of talk about "breaks and stuff like that." (*Id.* at 34.) They did not talk about "management and things like that." (*Id.*) He denies ever seeing the Service Manager Job Description prior to his deposition. (*Id.* at 72.)

He denies ever interviewing any prospective employees. (*Id.* at 47.) Instead, he "talked to a couple employees while they were waiting to be interviewed by Dan [Keim]," the regional manager. (*Id.*) Keim "sometimes" would ask Brooks what he thought about the interviewees, but Brooks himself "never hired a single soul." (*Id.* at 74.) He did have occasion to recommend technicians for advancement or promotion (*see id.* at 82–83), but it is unclear how much weight his recommendations carried.

He never terminated anyone and denies that he had the authority to do so: "That was Dan's job, Dan or Rafe's job." (*Id.* at 62.) But Brooks does not recall that anyone was actually terminated from his store while he was working for TDI. He remembers that he had "one tire tech" whom he "didn't want there," and that tech was moved to a different store. (*Id.* at 62–63.)

### B.     Daniel Embry

Embry started as a sales associate at TDI's Smyrna store in December 2014 and reported to Kevin Brooks. (Doc. No. 47, Embry Dep. 16.) He was sent to Cincinnati soon after he was hired, to receive training as a sales associate. (*Id.* at 19.) He was promoted to service manager at the Murfreesboro Medical Center store in June 2015. He was promoted to general manager in August 2015. (*Id.* at 27.) He left the company in January or February 2016. (*Id.* at 32.)

Embry never saw a job description for general manager prior to preparing for his deposition. (*Id.* at 32.) He does not recall if anyone was hired at his store while he was service manager, but he did not sit in on any interviews. Likewise, he does not recall any terminations during his tenure. (*Id.* at 29.) When asked if he understood that his role as manager was to "manage and direct the operations of a Tire Discounters retail store," he agreed that that is what his job "should have been," but, he maintained, "Dan Keim literally told [him] everything [he] had to do as a general manager." (*Id.* at 34.) He backtracked somewhat regarding the scope of that statement, explaining that, other than selling tires, "I couldn't do anything else without approval . . . . I had to get approval for anything that I needed in that store, to schedule my own guys I had to get approval." (*Id.*) For example, when it came to scheduling, he was required to fill out schedules each week, but Keim invariably changed them. (*Id.* at 35.)

He testified unequivocally that he was not allowed to hire or fire employees and "wasn't allowed to really even interview." (*Id.* at 43–45.) He wanted to fire a particular employee after the employee cursed at him and walked out of the store, but Keim did not allow it. (*Id.* at 45.) He testified that Keim told him specifically that he was not "allowed to even hire a tire tech." (*Id.*) He also tried to get a sales associate promoted to service manager, but his recommendation "fell on deaf ears." (*Id.*) With respect to technicians, if they did their training, they generally got promoted as a matter of course, once he "sent the training up to corporate." (*Id.* at 45–46.) He did not believe that his recommendation for their promotion entered into the picture.

C.      **Joseph Gammon**

Plaintiff Joe Gammon began working for TDI in January 2015 and left in March 2016. He was hired as a manager trainee and was sent for two weeks of training in Cincinnati, which he found very helpful. (Doc. No. 48, Gammon Dep. at 42.) However, he denied ever seeing the

written Job Description for the general manager or service manager position prior to his deposition. (*Id.* at 104.)

A month after his hire, he was promoted to service manager. He worked as service manager for three months before becoming general manager in June 2015. He was moved to a different store that was chronically understaffed, but he was not allowed to hire more staff to meet the store's needs. Keim kept telling him, "it's a new store and we're trying to find the right people," but "it was always the roundabout." (*Id.* at 69.) He testified that he trained at least two employees whom he hoped he would be allowed to keep as employees at his store, but it was not his "call." (*Id.* at 70.) They were sent to other stores instead. (*Id.* at 86.) He never had a service manager the entire time he was employed as general manager and was not given the option of hiring one. (*Id.* at 91, 146.) Moreover, while he would prepare weekly schedules for his employees, Keim invariably changed them and, not infrequently, pulled employees from Gammon's store to place them at different stores, requiring Gammon to cover as best as he could. Gammon did not have authority to give an employee a day off—Keim had to approve it.

As an example, Gammon relayed an instance when he had two employees who needed days off back to back, so the schedule Gammon prepared reflected their requests. The schedule Keim sent back disregarded the employees' requests and gave each employee the day off the other had requested:

> One guy had to have a Tuesday off, the other guy had to have a Wednesday off. And so when I submitted the schedule to Dan [Keim], it was like that. He didn't like that. He swapped it, for whatever reason. He swapped it back. So that would have meant both guys were going to miss whatever appointment they were going to have.

*Id.* at 92–93. Gammon had no authority to give the men the days off that they had requested, but the two employees more or less took matters into their own hands:

> And so when the schedule came back, . . . I told the guys, . . . he swapped it back.

> I said, I think that he's going to expect you guys to work like this. And . . . what ended up happening was, I believe the first employee on the Tuesday, he just ended up calling out.
>
> So, therefore, it just meant by default now I had to call the other guy and see if he could come in and cover it. And so he did. And then the other one . . . , they had . . . figured out that they could do this and get around it. And so that's what they ended up doing.

*Id.* at 93. Keim was not pleased by the work-around and implicitly threatened Gammon's job over the matter:

> Well, when Dan found out that they did not follow the schedule that he had set forth, he told me that, you know, it's a condition of employment. They're going to follow the schedule that I submit to you, not the one you submit to me.

(*Id.* at 93–94.)

Gammon denies ever sitting in on, or participating in, interviews of prospective employees. (*Id.* at 107.) He also denies that he had the ability or discretion to fire employees. He provided an example of an employee who performed poorly and whom he wanted to fire. He brought the issue to Keim's attention, but Keim told him "it wasn't up to [him] to make that decision." (*Id.* at 129.) He agrees that he could make the recommendation but maintains that he could not make the decision and that his recommendation was disregarded in that instance. Later, in the case of two employees who committed a similar but less egregious mistake, Gammon wanted to give them a written warning instead of firing them. Keim overrode that decision as well and forced him to fire them:

> They're going to be terminated. You don't have a choice in this matter. He let me know that I didn't have a choice in that matter. . . .
>
> When I asked him, I said . . . , well, what if I say no, I don't agree with that and I'm not going to present this [termination notice]? He told me my job would be in jeopardy. It was a condition of employment. That was—that was something he used a lot, condition of employment.

(*Id.* at 135–36.)

Gammon also testified that, as service manager, he never participated in hiring, formal discipline, or terminations. (*Id.* at 140.)

### D. David Gater

Plaintiff David Gater had two stints at TDI, the first in Kentucky, from 2010 to 2013. He was recruited to work for the company again in 2014 by Rafe Barber and came on board as a manager trainee at TDI's Mount Juliet store in March 2014. (Doc. No. 44, Gater Dep. 26.)

He was promoted to service manager at the Smyrna store within three or four weeks. (*Id.* at 29.) He held the position from May through August 12, 2014, when he resigned because the hours were too long. (*Id.* at 31–32; Resignation Notice, Doc. No. 44-2.) The Complaint in this case was filed on August 23, 2016. (Doc. No. 1.)

### E. Matthew Ward

Ward was employed as a manager trainee at TDI in June 2014. He trained for a week at the Mount Juliet store and then was moved to Smyrna, where he stayed for the rest of his tenure with the company. (Doc. No. 45, Ward Dep. 16–22.) He was promoted to service manager in November 2014. He was unhappy with that promotion, because he had been led to believe he would be promoted to a general manager position, where he would have had a better opportunity to match the salary of the job he left to come to work for TDI. (*Id.* at 23.) He quit in February 2015, after giving two weeks' notice. (*Id.* at 24.)

He never saw the Service Manager Job Description prior to his deposition. (*Id.* at 25.) Although several tire technicians and mechanics were hired while he was service manager, he never participated in any interviews of any candidates and was not asked his opinion of any of the candidates. (*Id.* at 28.) He does not recall any terminations during his tenure, though several people quit. He remembers that "one guy got terminated – well, I wouldn't call it a termination,

he turned in a notice, and when he turned in his notice . . . Dan Keim escorted him off the property." (*Id.* at 29.)

Ward also testified that he never "corrected or disciplined anybody at all." (*Id.* at 29.) Instead, he offered general guidance and corrections, "just general safety" precautions. (*Id.*) He testified generally that "what's seen on paper and what they try to get you to believe is not in fact the realization and the happenings within Tire Discounters." (*Id.* at 40–41.)

### F.    Craig Workman

Craig Workman began his employment with TDI in November 2014. He believed that he was hired to be a general manager with the possibility of moving up to regional manager for a division that was opening up. (Doc. No. 46, Workman Dep. 26, 29–30.) He actually started as a manager trainee, where, he maintains, he received very little training. (*Id.* at 34.) He was promoted to general manager of the Smyrna store in February 2015. (*Id.* at 38–39, 68.) He quit in October 2015. (*Id.* at 37.)

Workman testified specifically that he "was not allowed to hire. Dan [Keim] did all the hiring." (*Id.* at 57.) He stated that Keim also did all the interviewing, although Workman believes he "might have sat in on one interview with him." (*Id.* at 58.) On one occasion, however, Workman recommended hiring a particular guy and communicated to human resources that he could use the guy two days a week and that Joe Gammon, who was also short-handed, could use the guy two days a week. Human resources forwarded the email to Keim, who responded to Workman's request by asking: "Will this guy be able to go to the new Brentwood store if needed? Right now we are fully staffed at Smyrna and all 3 Murfreesboro stores for TTs [entry-level tire technicians]." (*Id.* at 60–61; Doc. No. 46-4.) Workman testified that, although he felt that he was shorthanded, Keim "didn't think so." (Workman Dep. 61.) Ultimately, Workman was

not sure whether the person was hired at all, but he seemed to recall that Keim hired the person but placed him at a different store, not Workman's store. (*Id.* at 61–63.)

Workman also testified that he did not have ultimate authority related to the staffing of his store: "I also complained [to the regional managers] that we didn't have employees because he [Keim] pulled them all out without my permission and [would] bring different employees in." (*Id.* at 71.)

Workman testified that he did issue formal discipline to employees, by going through human resources and the company's official policies for doing so. He initially stated that he never personally fired anyone, but then recalled one instance when he was speaking to an employee about redoing a job he had done incorrectly. He stated:

> The employee started to walk off. You know what, forget it. I quit. You've been pressuring me. You're too – just started cussing, ranting, and raving. I said, you're gone, go, get your tools. I called Dan. I said, hey, this is what happened. He said, let him go and contact HR.
>
> And that's the only one I can remember on that.

(*Id.* at 85.)

Workman does not recall having seen the general manager Job Description but concedes that it was "probably . . . in the employee handbook," which was provided to him. (*Id.* at 69.)

## III.    SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim, the moving defendant must show that, as a matter of undisputed material fact, the plaintiff cannot establish at least one essential element of that claim. Once the moving party makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting]

forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d 374 (citing *Anderson*, 477 U.S. at 252).

## IV. ANALYSIS

### A. Statute of Limitations

A two-year statute of limitation applies to FLSA claims for unpaid overtime compensation, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). "Willful violation means a violation in circumstances where the agency knew that its conduct was prohibited by the Act or showed reckless disregard of the requirements of the Act." 5 C.F.R. § 551.104. Further, "[a]ll of the facts and circumstances surrounding the violation are taken into account in determining whether a violation was willful." *Id.* The plaintiff bears the burden of proving willfulness. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

The defendant argues that plaintiff David Gater's FLSA claims are subject to dismissal in

their entirety, because Gater's employment as a service manager with TDI ended more than two years prior to the filing of the Complaint in this case, and there is no evidence of a willful violation of the FLSA. It is undisputed that, unless the three-year limitations period for willful violations applies, Gater's FLSA claims are time-barred.

The evidence put forward by TDI in support of its argument shows that it consulted with counsel prior to establishing the service manager position and that the Department of Labor investigated in 2014 and 2015 and determined that the position was properly classified. (J. Ward Aff. ¶¶ 18, 26; WHISARD Compliance Action Report, Doc. No. 49-1, at 8–9.)[3]

In response, the plaintiffs point out that Gater testified that "the company had changed" during the time between his first stint with TDI, which ended in 2013, and his second stint, which began in 2014. (Gater Dep. 44; Doc. No. 71, at 12.) As a result of the changes, he felt he was no longer able to provide meaningful input in the operations of the store. (Gater Dep. 44.) The plaintiff argues on this basis that "Defendant knew how to allow Mr. Gater to conduct business so as to make him exempt; however, that culture changed under the micromanaged guidance of Mr. Keim and Mr. Barber." (Doc. No. 71, at 12.)

In other words, the plaintiffs are essentially arguing that, because TDI was aware of the existence of the FLSA and knew how to operate within its confines in 2013, its failure to do so in 2014 means that its violation of the FLSA was willful. The "knew or showed reckless disregard" standard established by the regulations, however, does not embrace such a broad construction of willfulness. Rather, the Supreme Court has held that "a standard that merely requires that an employer knew that the FLSA 'was in the picture' . . . virtually obliterates any distinction between willful and nonwillful violations." *McLaughlin*, 486 U.S. at 132–33. The Court also

---

[3] This Department of Labor investigation began after Gater's employment ended. (*See* Doc. No. 49-1, at 8 (identifying the period of investigation as 09/21/2014 to 01/11/2015).)

rejected a standard that would require only a showing that the employer, "recognizing that it might be covered by the FLSA, acted without a reasonable belief for believing that it was complying with the statute," noting that such a standard "would apparently make the issue in most cases turn on whether the employer sought legal advice concerning its pay practices." *Id.* at 134. As such, it would permit liability based on nothing more than negligence. *Id.* at 135.

Based on *McLaughlin*, courts within the Sixth Circuit have generally found the willfulness standard met where there is evidence in the record that the employer actually knew that its conduct violated the FLSA or was placed on notice that its conduct might violate the statute, whether by prior Department of Labor investigations, by prior complaints or lawsuits brought by employees, or otherwise. *See, e.g.*, *Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468 (6th Cir. 1999) (holding that the district court properly found that the defendants' violations were willful where the company's owner had been investigated for violations twice in the past, paid unpaid overtime wages, received explanations of what was required to comply with the Act, and assured the Department of Labor that he would comply in the future); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991) (finding willfulness where the employer had actual notice of FLSA requirements as a result of earlier violations, had agreed to pay unpaid overtime wages, and had assured future compliance with the FLSA); *Byrd v. ABC Prof'l Tree Serv., Inc.*, 832 F. Supp. 2d 917, 921 (M.D. Tenn. 2011) (finding that the evidence of past investigations and agreements to pay back wages constituted evidence of willfulness); *Wilson v. Guardian Angel Nursing, Inc.*, No. 3:07-0069, 2008 WL 2944661, at *20 (M.D. Tenn. July 31, 2008) (finding willfulness where the defendants purchased fifty percent of a company, with knowledge that that company had previously been sued by the Department of Labor for overtime violations and settled the suit by paying backpay to employees around the time of the agreement,

but failed to ascertain whether violations were ongoing (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir.1999) (finding recklessness where defendant company turned a blind eye toward the FLSA violations of a company that defendants took over)); *see also Thomas v. Doan Const. Co.*, No. 13-11853, 2014 WL 1405222, at *14 (E.D. Mich. April 11, 2014) ("Courts have found willfulness in situations where the defendant had previous Department of Labor investigations regarding overtime violations, prior agreements to pay unpaid overtime wages, and assurances of future compliance. Courts have also found willfulness in situations in which the employer deliberately chose to avoid researching the laws' terms or affirmatively evading them." (internal quotation marks and citations omitted)).

Conversely, courts have declined to find willfulness where there is no concrete evidence that the defendant knew or should have known that its practices violated the FLSA. *See, e.g.*, *Ouellette v. Ameridial, Inc.*, No. 5:16-cv-2144, 2017 WL 2972636, at *5 (N.D. Ohio July 12, 2017) (holding that a two-year statute of limitations applied to a collective-action FLSA case, where the complaint did "not actually allege that defendant knew that its procedures violated the statute" and did not allege "that defendant has been sued for FLSA violations previously, which would constitute sufficient notice to establish willfulness"); *Lopez-Gomez v. Jim's Place, LLC*, No. 2:14-CV-02309-JPM, 2015 WL 4209809, at *7–8 (W.D. Tenn. July 10, 2015) (rejecting plaintiff's argument that the defendant "willfully violated the FLSA as a matter of law," where the plaintiff had "not alleged that Defendants were previously investigated for FLSA violations," irrespective of the fact that the "Defendants did not make any attempt to consult with any professional . . . to ensure the payment (or nonpayment) of overtime complied with the FLSA").

The court finds that the evidence in this case, even viewed in the light most favorable to Gater, is insufficient to establish willfulness. The defendant has shown that the written job

description called for service managers to "assist" in hiring and firing, suggesting that their recommendations would be taken into consideration, and that it consulted with counsel in developing the job description for service manager (the only position Gater held). Gater has not shown that TDI, previous to or during his employment, had been sued for FLSA violations or investigated by the Department of Labor. He has not presented any evidence suggesting that TDI knew or recklessly failed to discover that it was violating the statute. Thus, even assuming that Gater was improperly classified as exempt, the evidence, at worst, suggests negligence on the part of the company in allowing a few particularly zealous regional managers to exert too much control over the stores in their region.

The plaintiff has the burden of bringing forth evidence that the defendant's actions concerning the FLSA were willful. Because there is no evidence of willfulness, the two-year statute of limitations applies. As a result, Gater's FLSA claims are time-barred, and TDI is entitled to summary judgment in its favor on those claims.

**B.      FLSA Claims for Overtime Pay**

*1.      The Executive Exemption*

"Congress enacted the FLSA in 1938 as a remedial statute 'designed to correct labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers. . . .'" *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 626 (6th Cir. 2009) (quoting *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143 (6th Cir. 1977) (some internal quotation marks omitted)). The FLSA requires employers to pay their employees overtime for work performed in excess of forty hours per week. 29 U.S.C. § 207(a)(1).

However, the FLSA contains certain exemptions from the overtime compensation

requirement, including exemptions for "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). FLSA overtime exemptions are "affirmative defense[s] on which the employer has the burden of proof," and those exemptions "are to be narrowly construed against the employers seeking to assert them." *Thomas v. Speedway SuperAm., LLC*, 506 F.3d 496, 501 (6th Cir. 2007) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974), and *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

In this case, TDI claims that the plaintiffs are exempt under § 213(a)(1) because they were "employed in a bona fide executive capacity," as that term is defined by the applicable regulations. Under those regulations, the "executive exemption" applies to any employee who is paid a salary "of not less than $455 per week"[4] and:

> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a). "The employer bears the burden of establishing the affirmative defense by a preponderance of the evidence, and the employer satisfies this burden only by providing

---

[4] The Department of Labor published a final rule effective December 1, 2016 raising the $455.00 per week requirement to $913.00 per week. *See* 29 C.F.R. § 541.600; 81 FR 32391-01, 2016 WL 2943519. The Honorable Judge Amos L. Mazzant, United States District Judge for the Eastern District of Texas, issued a preliminary injunction on November 22, 2016 enjoining the Department of Labor from "implementing and enforcing" the new regulation, *Nevada v. Dep't of Labor*, 218 F. Supp. 3d 520, 534 (E.D. Tex. 2016), and ruled on August 31, 2017 that the rule exceeded the Department of Labor's authority, *see Nevada v. Dep't of Labor*, 275 F. Supp. 3d 795, at *8 (E.D. Tex. 2017). Some of the plaintiffs were employed past December 1, 2016, but the parties apparently presume that the version of the regulation requiring payment of at least $455 per week applies.

'clear and affirmative evidence that the employee meets every requirement of an exemption.'" *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 847 (6th Cir. 2012) (quoting *Thomas*, 506 F.3d at 501).

### 2.    *Section 541.100(a)(4)*

There is no dispute that all plaintiffs made more than $455 per week while employed by TDI. Further, at least for purposes of the defendant's Motions for Summary Judgment, the plaintiffs concede that their primary duties consisted of management of a TDI store or management of the service department of a TDI store and that they all regularly directed the work of two or more employees. The only question confronting the court is whether TDI has established that each individual plaintiff had the authority to hire and fire other employees *or* that their "recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight." 29 C.F.R. § 541.100(a)(4).

The regulations provide that,

> [t]o determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105. However, an "employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.*

Whether an employee has the requisite authority under § 541.100(a)(4) depends upon the unique factual circumstances of each case. In those cases finding that the exemption is met, the testimony is typically unequivocal regarding the plaintiff's authority. *See, e.g.*, *Lovelady v.*

*Allsup's Convenience Stores, Inc.*, 304 F. App'x 301, 306 (5th Cir. 2008) (per curiam) (affirming the district court's decision that the defendant satisfied the fourth element because the plaintiffs testified that their hiring recommendations were almost always followed—the only exception being when a background check on a recommended employee disclosed a criminal record; they could fire employees without obtaining authorization from a higher manager; and their recommendations as to promotions and raises were usually followed); *Grace v. Family Dollar Stores, Inc.*, 845 F. Supp. 2d 653, 663 (W.D.N.C. 2012) (finding fourth element satisfied based on the plaintiff-store manager's own deposition testimony that she selected applicants for interviews, conducted interviews, recommended employees for promotions and demotions, "made frequent recommendations as to these matters to her district manager and her recommendations were almost always followed"); *Rainey v. McWane, Inc.*, 552 F. Supp. 2d 626, 632 (E.D. Tex. 2008) (finding the fourth element satisfied where the "uncontested evidence" showed that, although the human resources department did the initial hiring, the plaintiffs completed weekly employee evaluations, which were used to determine whether new employees became permanent, and recommended employee discipline, which was almost always followed).

To the contrary, in *Duffie v. The Michigan Group, Inc.*, the district court found that the defendant was not entitled to summary judgment based on a material factual dispute as to whether the plaintiff had the authority to hire and fire and as to whether her recommendations on personnel matters were given particular weight. No. 14-cv-14148, 2016 WL 28987, at *13 (E.D. Mich. Jan. 4, 2016), *motion for reconsideration granted in other part*, 2016 WL 8259511 (Jan. 15, 2016). There, the defendant showed that it had requested the plaintiff's input on hiring decisions four times in three years and had relied in some part on her suggestions twice. *Id.* The defendant argued that, because there were so few hirings and firings, the court "must instead

look to the relative size of the work force and the total number of times an employee was hired or fired." *Id.* The court disagreed, finding the evidence "insufficient to conclusively establish that defendant relied on plaintiff's input often enough that her input was given 'particular weight.'" *Id.*

Likewise, in *Ristovski v. Midfield Concession Enterprises, Inc.*, 2017 WL 3601950 (E.D. Mich. Aug. 22, 2017), the court found a material factual dispute as to the whether any of the three plaintiffs had the ability to hire or fire and as to whether their recommendations were given particular weight. With respect to plaintiff Ristovski, the defendant argued that the undisputed evidence showed that the company had hired at least one candidate whom Ristovski had recommended and that Ristovski sat in on interviews with the defendant's upper management, asked questions during interviews, provided her opinion at the conclusion of interviews, and could make hiring recommendations. *Id.* at *9. The court noted, however, that other evidence in the record indicated that the defendant's upper-level management alone made all hiring and firing decisions; that all employees were offered an incentive to refer candidates for hire; and that, during the year and a half that Ristovski was employed, the company hired 100 to 150 employees, but Ristovski participated in only three interviews, and her hiring recommendation was followed only once. *Id.* The court found that the evidence was not sufficiently conclusive to warrant summary judgment. *Id.*; *accord Bray v. Dog Star Ranch, Inc.*, No. 1:08-CV-1005, 2010 WL 889908, at *6 (W.D. Mich. March 10, 2010) (finding that the evidence that the plaintiff participated in one firing was "too isolated to clearly establish [the plaintiff's] authority").

### 3. The Plaintiffs' Authority to Hire and Fire

Turning to the case at bar, the court finds, first, that there is clearly a material factual dispute as to whether the plaintiffs had the authority to hire and fire. The evidence proffered by

the defendant consists of Jamie Ward's Affidavit and the written job descriptions for general managers and service managers. Ward attests that general managers had "the power, and authority to, interview, hire, discipline and terminate employees." (J. Ward Aff. ¶ 21.) And the written job description for general manager states that one of the "primary" responsibilities of a general manager is to "attract, hire, train, develop, evaluate and retain store employees." (Doc. No. 49-1, at 5.) Regarding service managers, Ward likewise asserts that they too had the authority to hire and fire (J. Ward Aff. ¶ 19), but he then states that service managers had only the authority to "assist" in hiring service center employees (*id.* ¶ 19), which is consistent with the written job description for service managers. Ward does not claim to have personal knowledge regarding the actual practices at the stores at issue here or as to whether the plaintiffs were actually involved in hiring and firing.

For their part, the plaintiffs uniformly testified that they did not have authority to hire and fire. (Brooks Dep. 62, 74; Embry Dep. 43–45; Gammon Dep. 129, 140, 146; Workman Dep. 57.)[5] The plaintiffs' testimony is sufficient to create a material factual dispute as to whether they had the authority to hire and fire, regardless of what their formal job descriptions stated.

### 4. The Weight Given the Plaintiffs' Recommendations

Ward's testimony does not address the matter of whether the plaintiffs' recommendations as to "the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight." 29 C.F.R. § 541.100(a)(4). The defendant, instead, relies entirely on the plaintiffs' deposition testimony in support of its argument that this element of the test is met. The court finds that the available evidence is insufficient to establish that any

---

[5] Plaintiff Ward was not specifically asked whether he had the authority to hire and fire, but his testimony generally establishes that he did not, since he did not participate in formal interviews and, as discussed below, his recommendations did not appear to carry great weight.

plaintiff's recommendations were given "particular weight."

### i. Kevin Brooks

As set forth above, Kevin Brooks worked as a general manager for approximately seven months, as service manager for approximately nine months, and as general manager again for approximately three months. During that period, according to his deposition testimony, he occasionally recommended technicians for advancement or promotion, but it is unclear how often this occurred or how much weight his recommendations were given. It appears generally from Brooks' testimony and that of others that the promotion of a technician largely depended on whether the technician had passed certain tests and met certain objective criteria, such that the manager's recommendation carried marginal weight, if any.

Brooks testified that he never interviewed prospective employees or sat in on interviews with Dan Keim. (Brooks Dep. 47.) Instead, he might talk to candidates informally while they were waiting to be interviewed, and Keim might ask him what he thought about the interviewees, but there is no evidence in the record as to whether Keim acted on Brooks' opinions. Brooks recalls one instance in which there was a tire tech whom he "didn't want there, but they moved him to a different store." (*Id.* at 62–63.) He does not actually indicate whether there was a causal connection between those events. He does not recall that any employees were actually terminated during his tenure. (*Id.* at 63.)

This evidence does not clearly establish that Brooks' recommendations were given any particular weight. The defendant has not carried its burden on summary judgment on that issue.

### ii. Daniel Embry

Embry was a service manager for TDI for approximately three months and a general manager for approximately six months. He testified that, during that time, not only was he not

allowed to hire or fire, he "wasn't allowed really to interview." (Embry Dep. 44.) He does not remember that anyone was hired at or fired from his store while he was at TDI, but he does recall that he was not permitted to fire an employee who cursed at him and walked out, nor was his recommendation that a sales associate be promoted to service manager acted upon. (*Id.* at 45–46.) Regarding the promotion of tire and service technicians, he understood that the individuals in these positions were promoted essentially as a matter of course if he "sent the training up to corporate." (*Id.* at 46.) His recommendation did not enter into the picture. (*Id.* at 45–47.)

Again, the evidence is insufficient to conclusively establish that the defendant relied on the plaintiff's input often enough that it was given "particular weight." The defendant has failed to meet its burden of establishing that Embry was covered by the FLSA's executive exemption.

### iii. Joseph Gammon

According to Gammon, his store was chronically understaffed during his approximately nine months as general manager, but he was never permitted to hire a service manager. Regional manager Dan Keim controlled the staffing schedule for his store, frequently pulling employees from Gammon's store to work at other stores. On one occasion, an employee Gammon believed should be fired or disciplined was not, and Keim specifically told Gammon that the decision to fire the employee was not his to make. Gammon was later forced to fire two employees who, he strongly believed, should not have been let go. Generally, he testified that, when he recommended a person for hire, that person was not hired, and when he offered an opinion to Keim that someone should not be hired because "they had no business working on cars," Keim hired that person. (*Id.* at 108.)

The evidence viewed in the light most favorable to the plaintiff strongly suggests that Gammon's suggestions and recommendations regarding the staffing, hiring, firing, discipline,

and promotion of other employees were not given any particular weight. The defendant has failed to meet its burden on summary judgment of establishing that Embry was covered by the FLSA's executive exemption.

### iv. Matthew Ward

Ward worked as service manager for TDI for a short three months. While several technicians were hired during his tenure, he did not participate in the interviews of any of the candidates and was not asked his opinion about any of them, indicating that his recommendations in the arena of hiring were not given any weight. He does not recall any terminations, and he never formally disciplined any of the employees under his supervision.

Once again, the plaintiffs' evidence establishes at least a material factual dispute as to whether Ward qualifies for the executive exemption.

### v. Craig Workman

Workman was a general manager for eight months. He testified that he did not have the authority to hire, that Keim did all the hiring, that he "might" have sat in on one interview. (Workman Dep. 57.) There is no evidence regarding how many employees were hired at Workman's store while he was general manager or how many interviews Keim conducted during that time.

Workman concedes that, on one occasion, he recommended that an employee be hired, via an email sent to human resources, which was forwarded to Keim. Keim responded by telling Workman that his store was fully staffed and asking whether the guy would be willing to go to the new store in Brentwood. Ultimately, the evidence in the record is inconclusive regarding whether this candidate was hired at all, but it is clear that he was not hired to work in Workman's store.

Workman denies ever firing anyone, but he described an incident during which he confronted an employee about a poorly done job. The employee became frustrated, announced that he quit, and began ranting and raving. Workman told him, "you're gone, go, get your tools." (Workman Dep. 85.) He relayed the incident to Keim, who told him to let the guy go and to report it to human resources. It is unclear from this evidence whether the employee actually was fired or whether he quit.

Regardless, even assuming that Workman's "recommendations" as to hiring and firing were taken into consideration on two occasions, as in *Duffie v. The Michigan Group*,

> [t]he issue here is that, because there were so few such scenarios, plaintiff's input as to the hiring and firing of one employee could be characterized either as an "occasional suggestion" or as routine participation. . . . At the summary judgment stage, those two instances are insufficient to conclusively establish that defendant relied on plaintiff's input often enough that [his] input was given "particular weight."

*Duffie*, 2016 WL 8259511, at *13.[6]

In short, with respect to Workman, too, the defendant has failed to establish that the FLSA's executive exemption applies.

### *4.    Conclusion – Executive Exemption*

Because there is a material factual dispute as to whether the plaintiffs had "the authority to hire or fire other employees" and as to whether their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight," 29 C.F.R. § 541.100(a)(4), TDI's Motions for Summary Judgment on the FLSA claims for overtime pay brought by plaintiffs Brooks, Embry, Gammon, Ward, and Workman must be denied.

---

[6] The same conclusion applies with equal force to each of the other plaintiffs' situations.

### C.     State Law Claims

TDI argues that the plaintiffs' state law claims are subject to dismissal on the basis that the Complaint does not incorporate any facts supporting independent claims for "Unjust enrichment/Quantum Meruit/Breach of Contract" and that, instead, the state law claims appear to simply mirror the FLSA claims. (*See, e.g.*, Doc. No. 49, at 17–18.) The plaintiffs did not respond to this argument in their joint Response (*see generally* Doc. No. 71), nor did they seek to respond to the defendant's Reply, which points out that the plaintiffs did "not even address Defendant's argument" regarding the state law claims in responding to the Motions for Summary Judgment. (Doc. No. 88, at 13.)

The court finds that the plaintiffs' failure to respond to the defendant's argument regarding the state law claims constitutes abandonment of those claims. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because [the plaintiff] failed to address it in either his response to the summary judgment motion or his response to [the defendant's] reply brief); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (affirming trial court's finding that a party's failure to properly respond to arguments raised in a motion for summary judgment constituted an abandonment of those claims).

Because the plaintiffs have abandoned their state law claims and failed to carry their burden on summary judgment as to those claims, TDI's Motions for Summary Judgment will be granted insofar as they seek judgment in the defendant's favor on those claims.

## V.     CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment as to David Gater's claims—the FLSA claims and the state law claims—will be granted in its entirety. The

remaining Motions for Summary Judgment will be denied with respect to the FLSA claims and granted with respect to the state law claims.

An Order consistent with these findings is filed herewith.

ENTER this 8th day of March 2018.

_____

ALETA A. TRAUGER
United States District Judge